IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARSHALL CARMACK,<br><br>  Plaintiff,<br><br>  v.<br><br>AMERICAN WORKBOATS, INC., AND AMERICAN MARINE CORPORATION,<br><br>  Defendants. | CIV. NO. 23-00345 JMS-WRP<br><br>ORDER DENYING DEFENDANT AMERICAN MARINE CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 77 |

## ORDER DENYING DEFENDANT AMERICAN MARINE CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 77

### I. INTRODUCTION

Defendant American Marine Corporation ("AMC") seeks summary judgment on the first three counts of Plaintiff Marshall Carmack's ("Carmack") Complaint alleging: (1) Jones Act negligence (count 1); (2) unseaworthiness (count 2); (3) maintenance, found, and cure (count 3); and (4) vessel-owner negligence (count 4). *See generally* ECF No. 49.[1]  AMC argues that because Carmack was a land-based construction worker and not a "seaman" under the

---

[1] Co-Defendant American Workboats, Inc. has been dismissed from this action, without prejudice. *See* ECF No. 48; ECF No. 77-1 at PageID.251.

Jones Act, 46 U.S.C. § 30104 et seq., these counts must be dismissed. *See generally* ECF No. 77. For the following reasons, AMC's Motion is DENIED.

## II. BACKGROUND

Carmack's operative complaint alleges that, at all material times, AMC employed him as a Jones Act "seaman." ECF No. 49 at PageID.163. On December 2, 2022, Carmack alleges that he was injured aboard *AWB 82*, a special-purpose barge outfitted with a Caterpillar 329 excavator used to drill and install piles (auger-drilled holes filled with concrete) at Maalaea Harbor, Maui County. *Id*. at PageID.163–164; ECF No. 78-4 at PageID.297; ECF No. 102 at PageID.461. At the time of the injury, Carmack's project manager was attempting to shift a heavy auger bit that was hanging over *AWB 82*'s starboard side by a hook on the end of the excavator's boom, but in doing so Carmack's right hand and wrist became caught between the excavator's bucket and *AWB 82*'s starboard bulkhead. ECF No. 49 at PageID.163–164; ECF No. 102-1 at PageID.494. Carmack suffered permanent, painful and disabling injuries to his right thumb, right hand, and right arm. ECF No. 49 at PageID.164.

On August 16, 2023, Carmack filed a Complaint (and subsequently an Amended Complaint, and Second Amended Complaint) for compensatory damages under the Jones Act and general maritime law. AMC filed its Motion for Partial Summary Judgment on February 10, 2025, ECF No. 77. Carmack filed an

opposition on March 24, 2025, ECF No. 101, and AMC filed a reply on March 31, 2025, ECF No. 117. The court held a hearing on April 14, 2025.

### III. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"; instead, the opponent must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation marks omitted). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle*, 627 F.3d at 387 (citation omitted); *see also Anderson*, 477 U.S. at 248 (stating that a party

cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).  "Where evidence provided by the moving party conflicts with that provided by the nonmoving party, [courts] must 'assume the truth of the evidence set forth by the nonmoving party with respect to that fact.'"  *Haw. Disability Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987)).  "[T]he court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Celotex*, 477 U.S. at 322).  Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party.  *Matsushita,* 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

# IV. DISCUSSION

## A. Evidentiary Objections

As a preliminary matter, the court addresses evidentiary objections raised by each party. Neither has merit.

### 1. Carmack's Objection

Carmack challenges declarations filed by AMC Vice President and Secretary Megan Keane ("Keane") and AMC Executive Vice President David Shahnazarian ("Shahnazarian") as not based on personal knowledge or authenticated employment records. *See* ECF No. 101 at PageID.446–447; *see also* ECF No. 102 at PageID.469–471 (objecting to AMC's concise statements of fact ¶¶ 36–42, 44 based on Federal Rules of Evidence 602, 803(6), and Federal Rule of Civil Procedure 56(e)).[2]

Carmack appears to rely on an outdated rule that a court cannot consider unauthenticated documents in a motion for summary judgment. *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."). But this standard was abrogated by 2010 amendments to Federal

---

[2] Carmack also argues that "AMC invites . . . error when it urges this Court to rule against CARMACK's seaman status simply because he accepted [Longshore and Harbor Workers Act] benefits." ECF No. 101 at PageID.445. Although it is not clear that AMC makes such an argument, to the extent it does, the court rejects it.

5

Rule of Civil Procedure 56. Now, Rule 56 "mandate[s] only that the substance of the proffered evidence would be admissible at trial."[3] *David v. Betts*, 734 F. Supp. 3d 1050, 1079 n.20 (D. Haw. 2024) (quoting *Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 92223 (D. Nev. 2019)) (emphasis omitted); *see also De La Torre v. Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1075 (D. Ariz. 2008) ("[T]hough [a party] is not required to produce evidence in a form that would be admissible at trial, [it] must show that [it] would be able to present the underlying facts in an admissible manner at trial.").

  Here, Keane (AMC Vice President and Secretary) and Shahnazarian (AMC Executive Vice President) both provide declarations based "upon personal knowledge" and a review of "records maintained in the ordinary course of AMC's business." *See* ECF No. 78-3 at PageID.292; ECF No. 78-4 at PageID.297. A sufficient foundation has been established to show that the objected-to evidence would be admissible at trial. As a result, Carmack's evidentiary objection lacks merit.

  **2. *AMC's Objection***

  AMC characterizes Carmack's declaration in opposition to the Motion—which sets forth his work history with AMC and states that he "spent

---

[3] Rule 56(c)(2) states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

6

more than 80% of my overall work time with AMC afloat, aboard [an AMC vessel] and have repeatedly crewed AMC tugs and barges," ECF No. 102-1 at PageID.476—as "self-serving" and "not competent, not supported by the evidence claimed and/or . . . completely lacking in foundation and authentication." *See* ECF No. 117 at PageID.761.  This objection is also without merit.

First, "declarations oftentimes will be 'self-serving'—'[a]nd properly so, because otherwise there would be no point in [a party] submitting [them].'" *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (some brackets added) (quoting *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999)); *see also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("The district court can disregard a self-serving declaration that states *only* conclusions and not facts that would be admissible in evidence) (emphasis added).

Second, although the "district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence," *Nigro*, 784 F.3d at 497, Carmack is certainly able to testify as to his own work history.  Under Rule 56(c)(4) an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Here, the facts to which Carmack attests are based on personal knowledge, would be admissible at trial, and Carmack is certainly

7

competent to testify as to his own work history. As a result, AMC's evidentiary objection lacks merit.

**B.     Legal Standard—Jones Act Seaman Status**

Although the Jones Act does not define the term "seaman," the Supreme Court has established a "status-based standard" with two essential requirements: (1) The employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission"; and (2) the employee must have a "connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (citation omitted).

Determination of seaman status is a fact-specific inquiry that is usually a question for trial. *Id*. at 371; *see also Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554 (1997) (finding that the issue of seaman status under the Jones Act "is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury"). Summary judgment may be appropriate, however, if "the facts and the law will reasonably support only one conclusion." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991); *see also Chandris*, 515 U.S. at 371 ("And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.").

The first requirement—that Carmack's work contributed to the function of *AWB 82*—is "very broad" and renders "[a]ll who work at sea in the service of a ship . . . *eligible* for seaman status." *Chandris*, 515 U.S. at 368 (internal quotation omitted).

"The crux of the second prong of the 'seaman' test involves distinguishing land-based from sea-based employees by examining the employee's activities and duties." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 786 (9th Cir. 2007). It is designed to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Chandris*, 515 U.S. at 368; *see also Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289, 1293 (9th Cir. 1997) ("[T]he purpose of the substantial connection test is to separate land-based workers who do not face the perils of the sea from sea-based workers whose duties necessarily require them to face those risks.") (citations omitted). The Supreme Court has recognized "an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the

service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Chandris*, 515 U.S. at 371.[4]

## C.   Analysis—Jones Act Seaman Status

Because the parties do not dispute the first requirement, the court focuses on the second prong of the *Chandris* test—whether Carmack had a connection to a vessel in navigation or to an identifiable group of such vessels that was substantial in terms of both its duration and nature.

Carmack began working for AMC in June 2003 as a laborer. ECF No. 78 at PageID.270; ECF No. 102 at PageID.462. Around 2008, Carmack joined Operating Engineers Local 3 and, except for occasional layoffs due to lack of work, he worked for AMC over the next 15 years. ECF No. 78 at PageID.271; ECF No. 102 at PageID.462. Carmack does not possess a Coast Guard license or Merchant Mariner Credential, has never had to sleep aboard AMC's vessels and did not sign seaman's articles as a condition of employment with AMC. ECF No. 78 at PageID.271, 272; ECF No. 102 at PageID.462, 464–465, 466.

AMC was awarded a contract to repair Maui's Maalaea Harbor (the "Project") by the State of Hawaii, with work commencing in May 2022. ECF No. 78 at PageID.270; ECF No. 102 at PageID.461; ECF No. 102-1 at PageID.490.

---

[4] *Chandris* recognizes that this thirty percent rule of thumb "serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases." 515 U.S. at 371.

AMC was generally responsible for demolition work, site preparation, precast concrete pile installation, fabrication, and installation of 17 aluminum framed finger piers; this work was both on land and over water.  ECF No. 78 at PageID.270; ECF No. 102 at PageID.461.  The Project utilized barge *AWB 82*, which measured approximately 82 feet long and 26 feet wide.  ECF No. 78 at PageID.272; ECF No. 102 at PageID.467.  The excavator on board *AWB 82* utilized augers to drill holes into which the piles were installed.  ECF No. 78 at PageID.270; ECF No. 102 at PageID.461.  At times, Carmack would help reposition *AWB 82* for pile placement.  ECF No. 78 at PageID.271; ECF No. 102 at PageID.464.

As to Carmack's connection (or lack thereof) to *AWB 82* (or to an identifiable group of vessels in navigation) that is substantial in terms of its nature, Keane summarily attests:

- Carmack's working background with AMC focused on construction work.

- While working for AMC, Carmack was assigned to a project, not a vessel, nor as a member of the crew of any vessel on the Project.

- Carmack's assignment to the Project was to perform construction work.

Keane Decl. at ¶¶ 5, 9, 10, 11, ECF No. 78-3.  As to duration, Keane attests that Carmack spent 28% of his time on projects in which "he may have been

11

in the service of AMC's vessels or barges away from a dock or pier and/or

underway":

- Based on accounting and payroll records, Keane calculated the following percentages Carmack spent doing certain types of work:

  | On Land Maintenance | 23.45% |
  |---|---|
  | On Land Construction | 23.17% |
  | Tied to Dock Maintenance | 5.62% |
  | Tied to Dock Construction | 2.35% |
  | In Harbor Dredging Work | 22.07% |
  | In Harbor Construction Work | 17.42% |
  | Offshore Dredging Work | 5.87% |

- "Only 'In Harbor Dredging Work' and 'Offshore Dredging Work' could arguably be considered traditional seamen's work."

*See* Keane Decl. at ¶¶ 5, 9, 10, 11, 13–21, ECF No. 78-3. Shahnazarian also attests

to the land-based nature of Carmack's work, as summarized:

- The Project involved heavy civil construction similar to AMC's land-side projects; AMC's construction crew, including Carmack, used the same tools and equipment which are common to land-based construction work.

- Carmack served as a construction hand on the Project, working on the stationary barge where the excavator was being used. *AWB 82* served as the platform for pile placement.

- Similar to land-based construction, each night Carmack was able to return to a home and "was not forced to ride out a storm if the weather turned."

- While Carmack occasionally handled lines, line handling is a regular task performed by longshoremen and marine construction hands. Line handling on a construction barge is merely incidental to the construction work.

- *AWB 82* was in a protected location and did not experience "boarding waves" or have to move to seek shelter in a storm. It remained on the construction site fixed in place by a system of spuds or tied to the dock throughout the Project. The only transportation provided by *AWB 82* was incidental to repositioning it for continuing work operations.

- Land and land-based assistance was mostly within 200 yards from shore or the dock.

- Carmack and the rest of AMC's construction crew were not exposed to the same perils created by storms, heavy weather, sinking of the vessel, fires, drowning, or the perils to which seamen are exposed on vessels miles from shore.

*See* Shahnazarian Decl. at ¶¶ 7–9, 14–19, 23–27, ECF No. 78-4.

But Carmack paints a different picture. For instance, he claims that he "spent more than 80% of my overall work time with AMC afloat, aboard one or another of the company vessels . . . and have repeatedly crewed AMC's tugs and barges on intra- and inter-island voyages." ECF No. 102-1 at PageID.476.

As to the nature of his connection to *AWB 82*, Carmack asserts that during his 19-plus years with AMC, he was an "Operator/Deck Hand" for various vessels in AMC's fleet, *id*. at PageID.476, and performed sea-based work:

- He helped navigate vessels "as they moved to, from, and around worksites," maintained communication with other vessels, and stood lookout for other vessel traffic.

- He "regularly handled lines and ground tackle, operated deck winches, set anchors, raised and lowered spuds, and stood look out," as well as "'receive tow' or 'break tow' (making up or casting off a towline)[,] 'Mississippi up' (lash up to the stern of a barge), or 'hip up' (lash up to the side of a barge)."

- *AWB 82* "had the ability to move . . . short distances." When it was towed long distances, Carmack often rode aboard and "regularly helped fleet or kedge" it when relocating on site and "routinely steered and navigated" other vessels used to push *AWB 82* from one onsite location to another.

- He would also steer or navigate a crew boat between the shore and *AWB 82* at the beginning and end of each shift.

Carmack Decl. at ¶¶ 5, 8, 14, 18, 20, 21, 30, ECF No. 102-1. Describing a typical day of work on the Project, Carmack attests:

> [T]he *AWB 82* barge crew would move the barge about six times a day for each pile location. There were two piles for every pier. This would require me to tend lines; boat to barge; be exposed to waves and tides; use required [personal protective equipment]; risk going overboard; work on floating crane mats all day long; signaling from crane mat; and moving the barge into position for loading and offloading. The *AWB 82* was never permanently secured to the shore and was moved approximately 6–12 times a day during the drilling and driving phase at Maalaea Harbor.

*Id*. at ¶ 31. As for risks relating to his work on navigable water, Carmack attests that:

- He made "at least [six] inter-island voyages, approximately 4,000 intra-island voyages, and over 13,000 on-site moves."

14

- He was required to wear a Coast-Guard-approved personal flotation device or life jacket.

- All AMC barges and vessels were subject to swells, waves, vessel wakes, currents and occasional extreme weather and the tugs, barges, and boats he served all heaved, rolled, yawed, and pitched in time with the winds and seas, even when riding at anchor.

- The crew had to take those winds and seas into account, together with the tides and local currents during dredging or pile driving operations. They also typically kept a precautionary "chase boat" or "safety boat" on site at those dredging and pile-driving sites in case someone fell overboard.

*Id*. at ¶¶ 6 & 9.

This conflicting evidence creates a genuine issue of material fact as to Carmack's seaman status, consistent with *Delange v. Dutra Construction Co., Inc.*, 183 F.3d 916 (9th Cir. 1999), and *Scheuring v. Traylor Brothers, Inc.*, 476 F.3d 781 (9th Cir. 2007). In *Delange*, on the day of his injury, the plaintiff was assigned to a piledriving crew on a barge that served as the work platform, which was towed by tugboat. 183 F.3d at 918. Although he was not permanently assigned to a crew, he occasionally performed work typically done by deckhands, such as securing and stowing cargo, handling lines, and serving as a lookout; once, he even piloted a tug. *Id*. Delange also stated that more than 80% of his time was spent onboard the barge, where "most" of the work involved crewman and

15

deckhand duties. *Id*. Under this evidence, the court concluded that Delange raised a triable issue of fact as to his status as a Jones Act seaman. *Id*. at 919.

Similarly, *Scheuring* acknowledged that—even if the evidence was "somewhat limited"—the "relatively minor" movements of a derrick barge used in construction projects and the sea-based duties of the plaintiff, "although ancillary to his core responsibility as a crane operator, raise genuine issues of material fact which warrant[ed] jury consideration." 476 F.3d at 787. The plaintiff, a crane operator, helped to move the barge by "fleeting, or heaving back and forth on her anchor lines, for purposes of repositioning the barge for the next set of piles to be driven." *Id*. at 783. He "handled lines, weighed and dropped anchors, stood lookout, monitored the marine band radio and spliced wire and rope." *Id*. Scheuring alleged that the barge "was subject to sea swells, wind waves, vessel wakes and tidal currents," *id*. at 787, and that he performed "sea-based" duties. This evidence created a genuine issue of material fact for trial. *Id*.

Consistent with *Delange* and *Scheuring*, Carmack's factual assertions raise a genuine issue for a jury to determine whether he was a Jones Act seaman.

\\\

\\\

\\\

\\\

## V. **CONCLUSION**

Accordingly, AMC's Motion for Partial Summary Judgment, ECF No. 77, is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 18, 2025.



/s/ J. Michael Seabright

J. Michael Seabright
United States District Judge